UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARJORIE CARSON, | ) | |
| | ) | |
| | ) | No. 12 C 5753 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| THE UNIVERSITY OF CHICAGO | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Marjorie Carson filed a four-count amended complaint against the University of Chicago Medical Center ("UCMC"), alleging age discrimination and race discrimination. R. 35. Count I is for age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*. Count II is for a willful violation of the ADEA. Counts III and IV are for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and 42 U.S.C. § 1981, respectively. UCMC has moved for summary judgment. R. 44. For the reasons that follow, its motion for summary judgment is granted.

## BACKGROUND

Carson is an African-American woman who is a former employee of UCMC. R. 76 ¶ 4. She was born on April 18, 1961. *Id.*

In 1983, Carson began working for UCMC. *Id.* ¶ 5. She became the Care Center Director in the Infusion Therapy Unit of UCMC in July 2007. *Id.* The Infusion Therapy Unit (or the "Unit") is an out-patient area where patients are administered chemotherapy. *Id.* Leslie Fulton, who was born in 1947, worked at UCMC from 1982 through 2012 and held the title of UCMS's Director of Out-Patient Operations/Medicine from 1999 through 2012. *Id.* ¶ 6. In that role, Fulton was responsible for Carson's hiring as the Care Center Director and frequently interacted with Carson several times per week while Carson was employed in that position. *Id.* Beginning in April 2011, Fulton stopped being Carson's direct supervisor, as Jerry Schissler, who became Section Administrator of Hematology/Oncology in December 2010, wanted to reduce Fulton's role in Infusion Therapy and "get to know . . . Carson and her strengths and her style." [1] *Id.* ¶ 6; R. 46-1 at 266 (13:9-12); R. 61 at 64:19-65:19.

Fulton prepared the job description and responsibilities for the Care Center Director position Carson held, which was in effect at all times. R. 76 ¶ 7. The "Job Summary" provided:

> Responsible and accountable for planning, organizing, and directing clinical and administrative activities related to the Infusion Therapy Unit and the Apheresis Suite. Responsibilities include the delivery of quality patient care in a financially responsible manner through collaboration with medical, nursing[,] and other support staff throughout the organization.

---

[1] The record is not entirely clear as to what Schissler's responsibilities were as "Section Administrator." Although, Fulton and Schissler both reported to Dr. Richard Schilsky, the Section Chief of Hematology/Oncology at UCMC during Carson's tenure as the Care Center Director. *See* R. 77-2.

R. 46-1 at 259. The "Job Duties" included the following:

Service Pride:

> Communicating with Patients and Customers
> Adjusting to Patient and Customer Needs
> Respecting One Another
> Maintaining an Appropriate Environment

. . .

**C. Personnel**

1. Recruitment and retention: Interviews and selects staff. Develops recruitment and hiring standards that are consistent with the Hospitals' HR policies and philosophy, and that promote retention of excellent employees.
. . .

**E. Communication**

1. Creates a work climate that encourages positive staff morale, motivation and commitment for all who participate in care in the Units. Conducts regularly scheduled staff meetings with nurse managers, physician directors, and staff which provide opportunities for discussion of staff and unit concerns.

2. Applies interpersonal communication skills to maintain an open network of communication among staff members, other health care professionals and hospital departments. Promotes effective communication process within the units and throughout the organization.

R. 46-1 at 260-61; R. 76 ¶ 7. Recruitment and retention of nursing staff was also a requirement of the position, which Carson understood. R. 76 ¶ 8.

Additionally, Carson was subject to the Civility and Service Pride Policy of the UCMC (the "Civility Policy"). R. 46-1 at 49-50 (133:16-134:4). The purpose of the policy is to "achieve an environment of collaboration and teamwork." R. 55-3. "Civility" under the policy is defined as "a demonstration of respect for others and

their feelings, doing to and for others what we would have done unconditionally for ourselves." *Id.* "Workplace Behavior" is defined as "behavior that creates an atmosphere and environment that enhances and promotes respect for the integrity, dignity and worth of each and every human being." *Id.* The Civility Policy further states that the University of Chicago Hospitals Health Systems (the "UCHHS") "will continually monitor and assess the level of civility through on-going communication throughout the organization." *Id.*

A Care Center Director generally has two supervisors: the Section Administrator for Hematology/Oncology and the UCMS Director of Out-Patient Operations/Medicine (Fulton). R. 61 at 10:22-12:16. When Carson became the Care Center Director, Kim Carli[2] was the Section Administrator for Hematology/Oncology. R. 76 ¶ 9. Kim Carli remained in that position and as Carson's supervisor until she left UCMC in October 2010. *Id.* ¶ 9. During that time period, Fulton and Kim Carli drafted Carson's performance reviews for the 2007-2008 and 2008-2009 review periods, taking into consideration input from faculty physicians. *Id.* ¶ 10. Once the reviews were completed, Fulton and Kim Carli would then share them with Carson. *Id.* Carson's review for the 2007-2008 period included the following assessment:

> While substantial progress has been made, there is still much more to achieve. Marjorie has areas that challenge her with complex activity, flow, and management (phlebotomy, apheresis). These areas require thoughtful and collegial relationships, requiring constant cultivation.

---

[2] There are two women with the last name "Carli" in this case: Kim Carli, a Section Administrator, and Diane Carli, a nurse who has worked in the Infusion Therapy Unit since 2003. R. 76 ¶¶ 9, 39.

> We believe Marjorie could enhance these relationships, and grow as a leader, by working collaboratively to improve operations in these areas.

*Id.* ¶ 11. According to Carson, Fulton told Carson in 2008 that she does not give high evaluations in an employee's first year so that the employee has something to strive for. R. 77 ¶ 23.

Carson's 2008-2009 review contained a similar critique to the 2007-2008 review:

> Marjorie's passion and strength can sometimes be perceived as stiff and inflexible. While this partially is the perception, Marjorie is responsible for her communication style. Marjorie should continue to work on collaborative decision making and improvement; work on relationship building across the program; and continue to build her and her staff's credibility.
> . . .
> For FY10, Marjorie should: [. . .] continue to build bridges and mange [sic] relationships with leaders and staff.

*Id.* ¶ 12. In Carson's self-evaluation for the 2008-2009 evaluation, Carson rated herself a "1," or "Needs Improvement," on a sale of 1 to 5 for "Patient Satisfaction." *Id.* ¶ 14. This rating was based on the results of a patient satisfaction survey of her Unit. *Id.*

UCMC conducted an Employee Satisfaction Survey in 2010. The survey had sixty questions that were divided among four "domains"—Organization, Employee, Commitment Indicator, and Manager—with the "Manager" domain relating to the relationship between the employees and the manager of their respective work area. *Id.* ¶ 15. Nineteen employees under Carson responded to the survey (Carson oversaw approximately twenty-five registered nurses), and many of the concerns

identified in the survey related to the Manager domain. *Id.* ¶ 15. Results for the Manager domain questions included the following:

| No. | Question | % Unfavorable |
|-----|----------|---------------|
| 11 | The person I report to is a good communicator | 37% |
| 12 | I am satisfied with the recognition I get for doing a good job | 37% |
| 12 | There is a climate of trust within my work unit | 37% |
| 14 | When appropriate, I can act on my own without asking for approval | 44% |
| 28 | The person I report to gives me useful feedback | 32% |
| 43 | The person I report to treats me with respect | 32% |
| 55 | The person I report to cares about my job satisfaction | 42% |

*Id.* ¶ 16.[3]

A meeting was held at some point where Dr. Schilsky presented the survey results to the faculty and other leadership employees of the Hematology/Oncology section. R. 46-1 at 211 (47:14-20). Carson was present at that meeting. *Id.* at 211-12 (47:21-48:4). Dr. Schilsky expressed concern with the Infusion Therapy Unit's nursing staff being unhappy because he felt it was a "critical group of employees[,] without whom it would be impossible to conduct business." *Id.* at 212 (48:9-15).

Carson began reporting to Schissler in December 2010 after Kim Carli left. R. 76 ¶¶ 18-19. Kim Carli had not yet completed Carson's performance evaluation for the 2009-2010 review period before leaving. R. 76 ¶ 18. Accordingly, Fulton prepared Carson's review for that period with the help of Schissler and Denise

---

[3] The parties do not direct the Court to any specific benchmark indicating what numbers would constitute exceptional, good, fair, or poor results.

Friesema, the acting Section Administrator from the time period between Kim Carli's departure and when Schissler took over. *Id.* ¶ 20. Kim Friesema and Schissler were asked to provide input they received from two of the highest-ranking physicians in the Hematology/Oncology Section—Dr. Schilsky and Dr. Phillip Hoffman, the Practice Leader. *Id.* Schissler signed the review as he was Carson's supervisor when it was completed, though he testified that he did not write any of the evaluation or offer any substantive input because he did not observe Carson's performance for the majority of the review period. R. 46-1 at 305 (168:9-18).

Carson received her evaluation on January 20, 2011, during a meeting with Fulton, Friesema, and Schissler. R. 76 ¶ 22. The performance review included various comments regarding Carson's managerial abilities and her inability to encourage communication between employees. *Id.* ¶ 21. For example, "[Carson] is often perceived by clinicians as being resistant to their requests"; "there is not an environment of open communication and trust either with clinicians or among the nursing staff"; and "[s]ince recruitment and retention of nursing staff is critically important to our operation, we urge [Carson] to focus on improvement in the items in the 'manager' domain of the recent survey results." *Id.* Carson received an overall score of 2.48. *Id.* ¶ 22. A 2.0 rating in a given category indicates the employee's "[p]erformance does not consistently meet the job requirements" while a 3.0 rating demonstrates the employee "consistently meets the job requirements." R. 46-1 at 130.

Carson felt the meeting was "degrading" because Fulton, Friesema, and Schissler are all white, and Carson considered Friesema to be her peer. R. 76 ¶ 73. Carson further testified that she believed that Schissler gave preferential treatment to white employees. R. 79-1 at 11 (41:8-42:11). In support of her assertion, Carson testified that Schissler reimbursed Friesema for a conference she had attended on "at least five" occasions, yet when Carson asked to be reimbursed, Schissler said no. *Id.* at 40:9-24. When pressed as to why Carson would not be reimbursed, Carson testified that Schissler stated, "Marjorie, look around. What do you think? You're the only one black here." *Id.* at 42:1-6. Carson testified that Schissler also stated, "How old are you? . . . Well, Denise [Friesema] is like 30 -- 35, 34, in her 30s." R. 79-2 at 117 (362:13-16).

Carson was automatically placed on a Performance Improvement Plan ("PIP") as a result of the deficient rating on her 2009-2010 evaluation. R. 76 ¶ 22. The PIP was for 90 days and was "to give [Carson] an opportunity to fix what was laid out for her." R. 46-2 at 35 (91:1-7). Carson went on FMLA leave the day after receiving the performance review, returning to work approximately two months later on April 25, 2011. R. 76 ¶ 22.

Carson received her 90-day PIP when she returned to work on April 25, 2011. R. 46-1 at 146. Schissler, as Carson's direct supervisor, signed the PIP and was responsible for administering it. R. 76 ¶ 23. The most relevant portion of the PIP reads as follows:

**PEOPLE:**

1) Review the workplace Civility Policy and Service Pride/Care Standards Policy and consider how your communications may be perceived by others—including physicians, protocol nurses, co-workers and direct reports. Be mindful that your past communications have been perceived as abrasive and unhelpful by clinicians, and intimidating or punitive by staff. You are expected to consciously adopt a more open, cooperative, and empowering demeanor in your interactions with others.

2) Review the feedback from the recent Employee Retention Plans for presentation to the Section Chief, Physician PDP Direct and Section Administrator within three weeks of your return to work. While employees reported a high degree of satisfaction with their coworkers and obviously take pride in the work they do, there are definite opportunities for improvement:

   a) 44% of respondents felt they could not act independently
   b) 42% of respondents did not feel that you cared about their job satisfaction
   c) 37% of respondents noted a lack of recognition of a job well done
   d) 37% of respondents felt you were not a good communicator
   e) 32% of respondents are hoping for more useful feedback
   f) 32% of respondents would like you to treat them with a greater degree of respect

   These are areas of concern for us, as staff recruitment and retention are critical to the success of our operation. We will need to see improvement in these scores within 60 days.

R. 46-1 at 147. The PIP further provided that the "Plan did not guarantee [Carson's] continued employment through completion of [the] 90-day timeframe" if she was "not making sufficient progress toward meeting the outlined expectations and becoming a satisfactory employee." *Id.* at 148. Carson submitted "Performance Improvement plan revision suggestions" two days later, on April 27, 2011. R. 76 ¶ 25. None of the suggestions were to the "PEOPLE" section illustrated above. *Id.*; *see* R. 46-1 at 149.

Carson and Schissler met about once a week over the course of the PIP to discuss Carson's progress. R. 76 ¶ 26. Schissler acknowledges that Carson "did complete some of the items [on the PIP]" during the time period at issue. R. 69 at 6-7 (174:9-22). According to Carson, Schissler also told her at some point that:

- "the physicians were coming back with very favorable remarks about [her]";
- she "had addressed the physician's prior concerns";
- "he was pleased Carson was identifying strategies for filling chairs in the Infusion Therapy Unit in the earlier hours of the day";
- "he was pleased that [she] contacted other nursing directors, identified that they had similar problems and had other nursing directors wanting to visit [her] facility";
- "he was pleased that she was supporting the nursing staff in their efforts to complete their [Bachelor of Science degree] and sit for their [Oncology Nursing Certification] exams;
- "he was pleased that she was out on the Unit assisting others with all tasks," "that others noticed her efforts," and "that the nurses were much calmer and [had] happy smiles on their faces";
- "he was pleased to see that [she] was completing her evaluations on a timely basis and that her evaluations were completed long before his own were completed"; and
- "he was pleased with the comments she made in her evaluations of nursing staff."

R. 76 ¶ 28.

Between 2009 and 2011, eight nurses working under Carson in the Infusion Therapy Unit spoke to Fulton about issues they had with Carson. R. 76 ¶ 17. They include Angel Thompson and Monique Barnes, who were both African American, and Kay Hengelmann, Rita O'Laughlin, Susan Meier, Trisha Heinlen, Alia Martinez, and Roxanne Boyle. *Id.* O'Laughlin, Meier, and Hengelmann approached Fulton in the summer of 2011. *Id.* ¶ 29. O'Laughlin, who has born in 1975, had

worked as an infusion therapy nurse at UCMC since 2005. *Id.* ¶ 30. Meier, who was born in 1954, had worked in the Infusion Therapy Unit since 2002. *Id.* ¶ 32. Hengelmann, who had been a nurse since 1975, joined the Unit in 2009. *Id.* ¶ 33. The nurses all explained to Fulton that they had difficulty getting along with Carson and did not like her managerial style. *Id.* ¶¶ 30-34. Fulton encouraged them to discuss their concerns with Schissler. *Id.* Fulton also directly relayed the nurses' concerns to Schissler and further informed Schissler that (1) two of the nurses (Hengelmann and Meier) were considering leaving UCMC, R. 46-1 at 225-26 (122:18-123:1); and (2) the Unit already had vacancies that it was having difficulties filling and "losing additional nurses would put [the Unit] in a risky situation for managing . . . patient care safely," *id.* at 226 (123:2-8).

Carson testified that she told Schissler in July 2011 that several of her nursing staff members were racist. R. 77 ¶ 14. She claims that she received criticisms about O'Laughlin and Hengelmann from African-American patients and that O'Laughlin and Hengelmann complained about two other African-American employees—Victoria Frazier-Jones and Michelle McCarter. R. 79-2 at 166 (409:12-411:19). After informing Schissler of these complaints, Carson testified that Schissler began having private meetings without her and that Schissler and Meier were "having emails back and forth even after work hours" that presumably she did not receive. *Id.* at 411:11-19. Apparently, this meant that Schissler and Meier were not including Carson in their email correspondence.

In a letter sent to Dr. Schilsky that was dated August 2, 2011, eleven nurses complained about how Carson was handling the approval of vacation time. R. 77 ¶ 36. According to Carson, the nurses were unhappy because Carson required the nurses to follow the rules for requesting vacation time, and she would not make exceptions. R. 79-1 at 20 (79:2-80:6). Carson did not receive a copy of the letter until August 21, 2011—four days before her employment was terminated. *Id.* ¶ 36. Carson testified that Schissler stated in regards to the letter and her approach to determining vacation time, "It looks fine, Marjorie. Just send out an email."[4] R. 79-1 at 23 (89:8-16).

On August 12, 2011, Fulton, Schissler, Meier, and O'Laughlin met to discuss what was occurring in the Infusion Therapy Unit. R. 76 ¶¶ 36, 46. Meier gave them a resignation letter, stating that she found it difficult to work under Carson (though she did not actually resign). *Id.* O'Laughlin stated that many of the staff members were unhappy. *Id.* ¶ 36. The nurses also discussed Hengelmann's desire to resign. *Id.* Thompson and Sharon Gayle, two African-American nurses, also complained to Schissler in August 2011 about Carson and the way she treated them. *Id.* ¶ 38.

As a result of these complaints, Fulton suggested to Schissler that a "climate assessment" of the Infusion Therapy Unit be conducted. *Id.* ¶ 40. A climate assessment involves speaking to the employees in a given department and taking note of their concerns. R. 46-2 at 25:1-17. Sara Austin, a previous Manager of

---

[4] From Carson's deposition testimony, it appears "Just send out an email" was in regards to how Carson should notify the nurses as to whether their requests for vacation were approved or denied. *See* R. 79-1 at 23 (89:8-16).

Employee and Labor Relations, R. 46-2 at 88:1-10, testified that "(i) there was no written policy governing how climate assessments were to be conducted, (ii) there was no policy or procedure regarding climate assessments, (iii) how climate assessments were carried out was case specific, and (iv) terminating an employee following a climate assessment without meeting with the employee to go over the results with the employee did not violate any rule or procedure (written or otherwise) at UCMC, R. 76 ¶ 70. The Civility Policy does not mention anything about a "climate assessment," nor does it lay out procedures for conducting one. *See* R. 55-3. It does, however, lay out certain procedures for addressing when "from time-to-time, individuals . . . may not behave in a way that reflects [the UCHHS] vision." *Id.* The policy provides as follows:

> To address those situations, the following process should be initiated:
>
> 1. Every effort should be made by individuals to resolve their issues quickly and directly between each other.
>
> 2. If the issue can't be resolved, seek the advice and support of the direct supervisor(s).
>
> 3. Supervisors should discuss the issues with the individuals involved, and make every effort to resolve the conflict.

*Id.*

Fulton thought that a climate assessment would provide a strategy to deal with the nurses' complaints about Carson and allow for a better understanding of what exactly was occurring. R. 76 ¶ 40. Schissler agreed that a climate assessment was a good idea and asked Fulton how they could initiate one. *Id.* ¶¶ 40-41. Schissler had not previously been involved in any climate assessments at UCMC.

*Id.* ¶ 71 Fulton told Schissler that they needed to meet with their assigned human resources representative, Lorna Harrell, an African-American woman who was UCMC's Director of Employee Relations from December 2010 until January 2012. *Id.* ¶¶ 41-43.

Schissler met with Harrell at some point in August 2011 and suggested that Harrell conduct a climate assessment. R. 46-2 at 24, 31 (64:18-23, 84:7-12). Harrell testified that Schissler "beat [her] to the punch" and that she would have suggested that one be completed had Schissler not done it. *Id.* at 31 (84:7-12). However, Harrell had not previously been involved with a climate assessment at UCMC. R. 76 ¶ 72.

Carson was not concerned when she learned that Harrell was going to conduct a climate assessment of the Unit. R. 79-1 at 24 (89:23-90:2). She asserts that Schissler told her, "[S]o they're going to do a climate assessment. They're no big deal, climate assessments are done all the time, but they're going to do a climate assessment." *Id.* at 89:19-22. Additionally, according to Carson, her department had previously conducted numerous climate assessments (all regarding white directors or managers—Donna Haley, Michelle Harnell-Bobel, Barbara Anderson, Donna Lisec, Fulton, and Katherine Ely). R. 79-2 at 13 (258:7-24). And none of those employees were terminated for violating the Civility Policy. R. 79-1 at 23 (90:6-92:17); R. 79-2 at 13 (258:7-282:24). A climate assessment was also performed regarding an anonymous manager in September 2008, and that person likewise

remained employed by UCMC.[5] R. 70-1 at 2-3. Carson, however, was not personally involved in conducting, nor did she participate in, any of those climate assessments. R. 76 ¶ 68.

Harrell conducted the climate assessment of the Infusion Therapy Unit during the week of August 22, 2011. *Id.* ¶ 48. In conducting the climate assessment, Harrell spoke to twenty-three nurses, all of whom reported directly to Carson. R. 46-2 at 26 (75:9-12). Harrell testified that it was a "diverse group of employees," comprised of both African American and white nurses. *Id.* at 42 (226:13-23). Harrell met with the nurses individually in her office and asked questions like, "What is going well?" and, "Do you have any concerns?" R. 46-2 at 27-28 (76:23-77:12); *see* R. 46-2 at 55-67. Harrell took notes as the employees gave their answers to the questions. *Id.* at 55-67. Of the twenty-three nurses, some of the nurses who complained about Carson were African American, and more than two cried during their interviews with Harrell. R. 76 ¶ 54. Harrell's written notes of the interviews demonstrate that thirteen of the nurses had complaints about Carson. R. 46-2 at 55-67. Harrell testified that she did not show her climate assessment notes to anyone, R. 46-2 at 33:14-15, though Schissler testified that Harrell gave him "a very abbreviated outcome of common complaints that [the] surveys had [identified] during the climate assessment," R. 46-1 at 293 (255:9-16).

Once Harrell finished the interviews, she reviewed her notes, conferred with the Vice-President of Human Resources (Lynda Goldman), and decided that

---

[5] The parties filed a redacted version of the climate assessment, blacking out the name of the manager at issue.

Carson's employment should be terminated. R. 46-2 at 18 (50:1-22). The decision to fire Carson was discussed with the Direct of Labor Relations, Jonathan Rothstein, who did not object to the decision. *Id.* at 18-19 (50:23-51:8). Harrell also communicated the decision to Schissler. *Id.* at 32 (86:21-24). Harrell's recommendation stemmed from: (1) her conclusion that Carson was not abiding by the requirements of her PIP; (2) "the quantity of people that gave [Harrell] consistent accounts of the horrible working conditions, intimidation, humiliation, belittling, unprofessionalism"; and (3) the "seriousness" of the relevant issues. *Id.* at 21 (53:2-12). Harrell also concluded that the nurses' complaints demonstrated Carson had been violating the Civility Policy. *Id.* at 49 (253:10-14). Schissler told Harrell that he needed to inform his bosses—Dr. Schilsky and Dr. Hoffman—of the decision. R. 76 ¶ 61. Both of them concurred with the decision, and Schissler relayed to Harrell that they were all in agreement with her decision to terminate Carson's employment. *Id.* Harrell then instructed Schissler to carry out the termination. *Id.* ¶ 63. Carson's employment was terminated on August 25, 2011. *Id.*; R. 55-2.

Carson disagreed with the information obtained during the climate assessment, especially the comments from Meier, O'Laughlin, and Hengelmann. R. 79-2 at 162 (407:20-408:4). Carson testified that the only reason the nurses thought she was "looking over their shoulders" was because she determined that "there were so many errors going on [in the Infusion Therapy Unit] that patients were dying." *Id.* at 408:1-4. Carson testified that she was doing "quality audits" to alleviate "patient safety concerns." *Id.* at 408:14-22.

After Carson was terminated, two African-American nurses who had been "Team Leaders" in the Infusion Therapy Unit—Gayle and Sonya Cavers, R. 77 ¶ 30—took over some of Carson's prior duties,[6] R. 76 ¶ 65. Gayle is two years older than Carson; Cavers is four years younger than Carson. *Id.*

## LEGAL STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, the non-moving party must produce more than a "mere scintilla of evidence," meaning "evidence on which [a] jury could reasonably find for the non-moving party." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In ruling on the motion, the Court considers the entire evidentiary record and "view[s] all facts and draw[s] all inferences in the light most favorable to the non-moving party." *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013); *Egan Marine Corp. v. Great Am. Ins. Co.*, 665 F.3d 800, 811 (7th Cir. 2011). In cases involving employment discrimination, a "plaintiff seeking to survive summary judgment must produce enough evidence that a rational jury could conclude that the employer took the adverse action against the

---

[6] As discussed later, the Court is not required to parse through the record to determine what nurses in the Unit took over what particular duties that Carson had previously been assigned.

plaintiff because [s]he is a member of a protected class." *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 777 (7th Cir. 2013).

## ANALYSIS

Carson sets forth claims for race and age discrimination. Title VII of the 1964 Civil Rights Act makes it unlawful for an employer to discriminate against an employee on account of her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA prohibits an employer from "discharg[ing] any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "A plaintiff may prove employment discrimination under the ADEA, Title VII, and § 1981[] using either the 'direct method' or 'indirect method.'" *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014).

"Under the direct method of proof, the plaintiff makes her case by pointing to evidence directly showing that her employer subjected her to an adverse employment action on an impermissible discriminatory basis—here, on the basis of race and age." *Andrews*, 743 F.3d at 234. "'Direct' proof includes both evidence explicitly linking an adverse employment action to an employer's discriminatory animus, and circumstantial evidence that would permit the trier of fact to infer that discrimination motived the adverse action." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (internal citations omitted). If the plaintiff relies on circumstantial evidence, the plaintiff must provide enough "various scraps" of evidence that, taken as a whole, allow the trier of fact to draw the inference that the defendant discriminated against the plaintiff. *Id.* at 995-96. "Typical kinds of evidence used for

this purpose include '(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action.'" *Id.* (quoting *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011)).

The "indirect method" is a "particular way of using circumstantial evidence at the summary judgment stage." *Morgan*, 724 F.3d at 996. This is the "burden-shifting method of proof recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which the plaintiff first establishes a *prima facie* case of discrimination, the employer responds by articulating a legitimate, nondiscriminatory reason for its action, and the plaintiff then has the opportunity to show that the employer's explanation is pretextual." *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 947 (7th Cir. 2013). To make out a *prima facie* case of discrimination, Carson must demonstrate (1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) UCMC treated similarly-situated employees out of the protected class more favorably. *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012). Only after Carson is able to satisfy those elements does the burden shift to UCMC to offer a legitimate, non-discriminatory reason for its actions. *Id.*

Carson argues that UCMC is not entitled to summary judgment on any of her claims because she has established a claim of race and age discrimination under both the direct and indirect methods. "[I]t is debatable whether the [direct and indirect methods] are sharply distinguishable[.]" *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 691(7th Cir. 2014) (citing *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)). But regardless, evidence submitted under either method that requires "guesswork and speculation [is] not enough to avoid summary judgment." *Good v. Univ. of Chi. Med. Cntr.*, 673 F.3d 670, 675 (7th Cir. 2012).

## I.      Race Discrimination

### A.      The Direct Method

Caron contends the following evidence creates a material question of fact regarding whether UCMC fired her as a result of her race: (1) Schissler refused to reimburse Carson when she attended a conference and, in explaining why Carson not be reimbursed, stated, "Marjorie, look around. What do you think? You're the only one black here," R. 79-1 at 11 (41:8-42:11); (2) UCMC treated similarly situated employees more favorably than Carson when conducting the climate assessments, R. 70-1 at 2-3; R. 79-1 at 23 (90:6-92:17); R. 79-2 at 13 (258:7-282:24); and (3) Schissler ignored Carson's complaints of racist behavior; told her, "Marjorie, people will be people"; and began having private meetings without her, R. 77 ¶ 14; R. 79-2 at 166 (409:12-411:19).

## 1. Conference Reimbursement

Carson argues that the fact Friesema was reimbursed for five conferences and Schissler would not reimburse her for one conference demonstrates the decision to fire her was tainted by racial animus. This argument is non-availing. As an initial matter, Carson does not provide any evidence demonstrating what conference she attempted to get reimbursed for and how that compared to any conference Friesema was reimbursed for. Nor does Carson provide any evidence regarding under what circumstance Friesema was reimbursed. Without knowing that information, it would be speculative to say that Carson should also have been reimbursed for the conference—a conference the Court knows nothing more about than there was "a conference" that "was job related according to [Carson's] certification," R. 79-1 at 10 (40:9-18). Moreover, although Carson's reimbursement requests went through Schissler, Schissler lacked the authority to authorize reimbursements for Friesema. R. 77-2 at 2 ¶ 3. UCMC provided the Court with an affidavit from Schissler and a supporting organizational chart from 2011 that UCMC produced during discovery. R. 77-2 at 5. The affidavit and chart indicate, first, that Schissler and Friesema both reported to the "Section Chief," Dr. Schilsky, and second, that Schissler and Friesema's direct reimbursement authorizations were both made by Dr. Schilsky. R. 77-2 at 2-5. Carson provides nothing to refute this evidence. It thus cannot be said that Schissler treated white nurses more favorably when determining conference reimbursements.

Next, Schissler disputes Carson's testimony that he said, ""Marjorie, look around. What do you think? You're the only one black here," R. 79-1 at 11 (41:8-42:11), when Marjorie asked why she would not be reimbursed for the conference.[7] *Id.* ¶ 3. For purposes of the motion, the Court must assume that Schissler made the statement. Even so, the Seventh Circuit has explained that "stray remarks are generally insufficient to establish discriminatory motivation[.]" *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010). To support an inference of discrimination, the remark must be: (1) made by the decision maker, (2) around the time of the adverse employment decision, and (3) in reference to the adverse employment action to raise the inference of discrimination. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008).

Here, Carson has not established that Schissler was the decision maker behind her firing. Rather, the evidence demonstrates that even though Schissler reached out to Harrell to perform the climate assessment of the Infusion Therapy Unit and was consulted about the decision to fire Carson, the decision was ultimately made by Harrell and Goldman, and approved by Dr. Schilsky and Dr. Hoffman. R. 46-2 at 18 (50:1-22); R. 76 ¶¶ 61-63. This is highlighted by Schissler's

---

[7] Carson also testified that Jackie Newsome-Ryan told her in January 2011, "They don't know what to do with you." R. 79-1 at 10—38:1-3. Carson said that she asked who "they" was, to which Newsome-Ryan responded, "Jerry and Leslie and Denise. . . . They don't know what to do with you because you're black and you're smart." *Id.* at 38:4-8. The Court will not consider this evidence because Carson did not offer any deposition testimony of Newsome-Ryan, so the statement is inadmissible hearsay. *See Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 942 (7th Cir. 2012) (explaining that inadmissible hearsay is properly disregarded on summary judgment (citing Fed. R. Civ. P. 56(c)(2))).

testimony that he "could make a recommendation to terminate somebody, but [he did not] have the authority to make that decision." R. 77-2 at 74 (173:1-3).

Carson also has not established *when* Schissler made the remark in question. Presumably, it was made sometime after December 2010 when Schissler became Carson's supervisor. But while there is no set cut-off date "by which comments must be made in order to support a finding of discriminatory intent," *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009), Carson has presented is no evidence Schissler made the remark around August 2011 when Carson was fired. *See, e.g.*, *Swenson v. Salient Corp.*, 559 Fed. Appx. 537, 539 (7th Cir. 2014) ("Because the comments preceded his discharge by nearly two months, they were not contemporaneous to the firing." (citing *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 910-11 (7th Cir. 2002))); *Petts*, 534 F.3d at 721 ("We previously have concluded that a decision maker's comment made more than a year before the adverse action fails to constitute evidence of discrimination under the direct method."). There also is no evidence that the remark was made in the context of Carson's termination or was "causally related" to UCMC's decision to fire Carson. *See Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1072 (7th Cir. 2012) (explaining that "[t]o be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process" (quoting *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996))); *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 351-52 (7th Cir. 2009) ("Statements by subordinates normally are not probative of an intent to [engage in prohibited

conduct] by the decisionmaker."). The comment, by itself or in conjunction with the other evidence, does not raise the inference of discriminatory bias.

## 2. Conduct After Carson Complained of Other Nurses' Racist Attitudes

Carson testified that she complained to Schissler on numerous occasions about certain nurses engaging in racist behavior. *E.g.*, R. 79-2 at 165 (410:16-24). Based on that, Carson contends that UCMC exhibited racial animus towards her when Schissler told her that "people will be people," failed to investigate her complaints, and had private meetings with other white nurses. As an initial matter, the "people" comment is insufficient to raise an inference of racial discrimination, just as Schissler's other comment when he denied Carson's reimbursement request was insufficient. Schissler was not the decision maker and the comment was not made in the context of the decision to terminate Carson's employment. Moreover, the comment, while inappropriate if made in response to allegations of racism, is not so abhorrent as to raise the inference that Carson was fired because of her race. *See Steinhauer v. Degolier*, 359 F.3d 481, 486-88 (7th Cir. 2004) (describing comments and remarks in a sex-based discrimination suit that, while improper, did not create an inference that sex motivated an employment decision); *cf. Doe v. Galster*, ___ F.3d ___, No. 13-2551, 2014 WL 4653063, at *4 (7th Cir. Sept. 19, 2014) (explaining that "gendered words like bitch and whore, even if used to describe both women and men, can be strong evidence that the harassment at issue is on the basis of sex"); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 701, 709-10 (7th Cir. 2013) (concluding that the employee's biased, discriminatory remarks about women and

Hispanics, in conjunction with a similarly situated employee being treated more favorably, raised an inference of a discriminatory motive); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se*." (quoting *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1994))). An individual must present more to establish a claim for discrimination than simply complaints about comments that they find objectionable. *See Manson v. GMC*, 66 Fed. Appx. 28, 33 (7th Cir. 2003) ("Federal civil rights laws do 'not guarantee a utopian workplace, or even a pleasant one.'" (quoting *Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994) ("[P]ersonality conflicts between employees are not the business of the federal courts."))).

Carson also contends that Schissler failed to investigate her claims of racial animus among the nurses and that Schissler held "private" meetings with white nurses, including Hengelmann and O'Laughlin. R. 77 ¶ 16. Carson cannot have it both ways. She says Schissler ignored her complaints of racist behavior, yet the evidence indicates that Schissler had meetings with the nurses who Carson claims were racist. R. 76 ¶ 38. Indeed, in order to investigate Carson's claims, Schissler necessarily would have needed to meet with the other nurses to hear their respective sides of the story, which he did. Carson nevertheless contends that those meetings and supposed "after hours emails" to support her allegation that Schissler excluded her and treated her less favorably by having the meetings with the other nurses. Carson's conclusory claims of random "private" meetings under these

circumstances would be insufficient for a jury to conclude UCMC fired her because of her race anyway. Carson may not have been included in some of the other staff members' conversations, emails, or get-togethers, but "[n]ot fitting into the clique" does not on its own establish a claim for discrimination. *Wilson v. Kautex, Inc.*, No. 1:07-CV-60-TS, 2009 WL 1657463, at *34 (N.D. Ind. June 10, 2009), *aff'd* 371 Fed. Appx. 663 (7th Cir. 2010).

Furthermore, although the climate assessment may have been initiated in response to complaints about Carson, the assessment also could have demonstrated that white nurses were harboring racial bias towards the African-American nurses if Carson's racial allegations were true. Surely, one or more of the other African-American nurses would have mentioned something to Harrell, an African-American woman who was conducting the assessment. Moreover, the evidence demonstrates the assessment was conducted, in essence, to determine the root of the problems in the Infusion Therapy Unit and how best to solve them—regardless of whether they were Carson-driven problems or nursing staff issues. Such a procedure is a reasonable response to Carson's alleged complaints to Schissler. That it resulted in the termination of Carson's employment does not raise the inference that UCMC fired her for an improper purpose, as opposed to Carson's unsatisfactory performance (as discussed below).

### 3. Climate Assessments & Corresponding Discipline

Carson's principal argument as to why she was improperly fired rests on her belief that UCMC improperly performed the climate assessment and treated other

26

similarly situated employees—Haley, Harnell-Bobel, Anderson, Lisec, Fulton, Ely, and the anonymous manager—more favorably in disciplining them.[8] But even if all of Carson's evidence on this point is credited, it does not result in a showing that Carson was treated differently because of her race.

Initially, Carson must demonstrate that the other employees are similarly situated. The question of whether another employee is "similarly situated" requires "a common sense analysis, not an . . . inflexible requirement that requires near one-to-one mapping between employees." *Alexander v Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (internal quotation marks omitted). But Carson must still demonstrate that the comparable employee(s) are "directly comparable" to her in "all material respects." *Id.* (quoting *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011)); *see Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ("It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?") (internal quotation marks omitted). She has not done that here.

Carson has presented no evidence that any of the other nurses at issue were placed on a PIP after receiving a yearly evaluation that can be described as deficient, as Carson's was. *See* R. 46-1 at 147. Carson has not presented any

---

[8] Carson admits that "her belief that these climate assessments occurred and/or her alleged knowledge of their details came from conversations with others, and that Carson was not personally involved in any of them." R. 76 ¶ 68. Thus, much of Carson's testimony about the other alleged climate assessments is inadmissible hearsay. Because the Court finds that the comparators are not similarly situated to Carson even considering all of her testimony, explicitly discussing which portions of Carson's testimony are inadmissible is unnecessary.

evidence that any of her comparators had already been subject to a PIP when the climate assessment was performed or when the disciplinary decision was made. Obviously, a climate assessment that it is performed on an employee who had already been placed on a PIP is significantly different than one that is not. Carson necessarily also has not presented evidence that any prior PIP *explicitly* required the comparator to review the Civility Policy and undertake steps to more adequately comply with it. Finally, Carson has not provided evidence indicating that any of the climate assessments were even conducted or initiated by the same people—i.e., Harrell and Schissler. Without that evidence, Carson cannot establish that she is similarly situated to her comparators. *See Martino v. W. & S. Fin. Group*, 715 F.3d 195, 202 (7th Cir. 2013) (explaining that "a plaintiff must *at least* show that the comparators (1) dealt with the same supervisor, (2) were *subject to the same standards*, and (3) engaged in similar conduct *without such differentiating or mitigating circumstances* as would distinguish their conduct or the employer's treatment of them") (internal quotation marks omitted) (emphases added); *see also Hester*, 726 F.3d at 948 (describing why the employees the plaintiff compared himself to were not similarly situated employees). This determination is highlighted by the fact that the record only includes one documented climate assessment, R. 70-1 at 2-3, and by Carson's admission that she has no personal knowledge of any of the other alleged climate assessments or the discipline administered after each was conducted, R. 76 ¶ 68.

Moreover, Carson's claim that the climate assessment was improperly conducted is without support. In her statement of material facts and responses to the UCMS's, Carson simply cites the Civility Policy to show that UCMC's conduct in this case violated a strict practice or custom as to how climate assessments are performed. *See, e.g.*, R. 76 ¶ 70. However, the Civility Policy does not even mention the phrase "climate assessment," let alone provide the procedures that must be followed when conducting one. The policy does describe three steps that *should* be taken to correct personnel issues that may be occurring. *See* R. 55-3. But to say that UCMC or those supervisors monitoring the Infusion Therapy Unit could *only* follow those three steps in verifying complaints about personnel in a unit or department is not for the Court to say. *See Blise v. Antaramien*, 409 F.3d 861, 867 (7th Cir. 2005) (explaining that a court does "'not sit as a superpersonnel department' where disappointed . . . employees can have the merits of an employer's decision replayed to determine best business practices"); *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 562 (7th Cir. 2004) ("As we have long held, we will not second-guess the decision-markers' business judgment."). That Harrell, in conjunction with Goldman (the Vice-President of Human Resources), concluded that Carson should be terminated without giving Carson an additional opportunity to rectify her behavior—which Carson was already supposed to be doing—does not demonstrate that the climate assessment was performed improperly. And Carson provides no other evidence, testimony or otherwise, indicating that UCMC's climate assessment of her was improper. *See Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805-06 (7th Cir. 2014)

(concluding that an investigation of the plaintiff did not raise an inference of discrimination because the plaintiff did not point to any policy, procedure, or other evidence demonstrating the investigation was improper). Thus, no inference of discrimination can be raised from the manner in which the climate assessment was conducted.

### 4. Cat's Paw Theory

Alternatively, Carson argues that she can succeed under a "cat's paw" theory that attributes the alleged improper racial animus of Schissler and the nurses to Harrell. "In the law of employment discrimination, the 'cat's paw' theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker 'as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014) (quoting *Smith v. Bray*, 681 F.3d 888, 897 n.3 (7th Cir. 2012)). To prevail under that theory, Carson must be able to show both that: (1) Schissler or the other nurses actually harbored discriminatory animus towards her; and (2) Schissler or the other nurses' conduct was a proximate cause of Carson's termination. *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 604 (7th Cir. 2014).

As it relates to Schissler, Carson has satisfied the first element with her testimony that Schissler made racially-charged statements when she asked to be reimbursed. Carson cannot, however, satisfy the second element—that Schissler's alleged discriminatory animus was a proximate cause of her termination. Even if Schissler is biased against African Americans, which for purposes of this motion the

Court will assume, the Seventh Circuit has explained, "Bigotry, *per se*, is not actionable. It is actionable only if it results in injury to plaintiff; there must be a real link between the bigotry and an adverse employment action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). It is undisputed here that Schissler asked Harrell to conduct a climate assessment of Carson and the Infusion Therapy Unit. R. 76 ¶ 44. But Schissler took no part in the climate assessment. *Id.* ¶ 55. He did not provide any feedback on Carson, he was not interviewed during the assessment, and he did not make the decision to fire Carson based on the results of the climate assessment. Rather, the climate assessment findings were the result of Harrell's interviews with *the nurses*. And the decision to terminate Carson's employment was based on the interview results, the consistency of the thirteen nurses' complaints, Carson's yearly evaluations, and the fact Carson had already been on a PIP for similar issues[9]—not Schissler's suggestion that a climate assessment be conducted.[10] *Id.* ¶ 58; s*ee generally Egonmwan*, 602 F.3d at 850

---

[9] There is no convincing argument that Schissler caused Carson to be on the PIP because of the 2009-2010 evaluation and, therefore, was a proximate cause in Harrell's decision when comparing the climate assessments results to the PIP. Schissler testified that he offered no substantive input in Carson's 2009-2010 evaluation (which automatically required Carson to be subject to a PIP), so any alleged racial biases of Schissler involving the PIP would not be the proximate cause of Carson's termination.

[10] There is an open question in this case as to whether Carson ever completed her PIP. It is undisputed that Carson was placed on the PIP on April 25, 2011, and that the PIP was for 90 days. The parties have not provided any evidence of whether Carson actually finished the PIP or when that might have occurred. Carson responded to UCMC's statement of material fact ¶ 58 that the PIP was completed on July 11, 2011, but she offers nothing in support of that particular date— testimony or otherwise. *See* R. 76 ¶ 58. Instead, she directs the court to 40 general

("[H]ow the investigation was triggered is not the point. Rather, the point is that, *after* the investigation was triggered, evidence of misconduct was uncovered . . . and various witnesses testified about [the plaintiff's] wrongdoing . . . –all without any input from [the defendant who initiated the investigation] or the other defendants."). The record evidence does not support the inference that any alleged racially-biased tendencies Schissler may have held were the proximate cause of Carson's firing. The link between Schissler and the adverse employment action is much too attenuated to support a cat's paw theory against UCMC.

To the extent Carson relies on any racial animus of the nurses under her, that argument fails as well. First, the record reveals that the nurses may have had a legitimate, nondiscriminatory reason for disliking Carson—a reason even Carson acknowledges was valid. Carson states in her response brief that "the staff's racist resentment towards [her] as a strict, black manager" caused them to complain

---

pages of her own testimony to argue that she "was never informed that [UCMC] was extending the time span of the PIP. *Id.* On the other hand, Schissler testified that Carson "did complete some of the items" on the PIP and that he "just d[id]n't know" whether he would have considered Carson's PIP "completed or not." R. 69 at 6-7 (173:4-16, 174:9-22). Considering that 90 days after the PIP was initiated was July 24, 2011, and the PIP was not extended, it seems as if Carson must have satisfied the obligations of her PIP because she was still working at UCMC until August 2011. Nevertheless, whether Carson had actually "completed" her PIP is immaterial. Even if Carson had completed what could be considered "probation," *see* R. 46-2 at 34-35 (90:20-91:7), Carson has not provided the Court with any information demonstrating that UCMC could only fire her while she was completing a PIP or that she was required to be placed on a second PIP before her employment could be terminated. Ultimately, Carson was aware at the time she was fired that she needed to conduct herself in a manner that would comport with the Civility Policy and the requirements of her position. The PIP was simply one of the many pieces of information highlighting the fact Carson knew she needed to adjust her conduct.

about her. R. 73 at 8. But in support, she describes racially-neutral reasons: how she "had been closely monitoring her staff due to suspicions by her that the nursing staff had been falsifying documents" and that "the nursing staff was unhappy because [she] was requiring the staff [to] follow the rules in requesting vacation time." *Id.* That information does not demonstrate that the nurses were harboring racial animus towards her. Instead, it actually provides a legitimate, nonracially-based reason why they did not like her; they thought she was a supervisor who was hovering over their shoulders and second guessing their work. Those reasons do not involve any improper racial discrimination. This is further supported by Carson's argument in her response brief that she "refused to permit neither the laziness of her nursing staff to jeopardize the health and safety of their patients nor a dispute over the approval of vacation time to interfere with service of patients in the Infusion Therapy Unit." R. 73 at 10 n.4. That argument, although not evidence, supports the inference that Carson was aware that the manner in which she was managing the Infusion Therapy Unit was making the nurses under her unhappy. It is not evidence of the other nurses harboring racial animus.

Nevertheless, Carson offers some evidence demonstrating that the other nurses might have harbored improper racial animus towards her. Carson testified that she believes the following nurses in her Unit were racist:

- Meier – because (1) black patients complained about her; (2) Meier spent inordinate time with white patients; and (3) Meier was insubordinate to Carson.

- Hengelmann – because (1) she undermined Carson's authority; (2) after befriending an African-American nurse, Hengelmann told everyone in the

Unit that the nurse was getting hip surgery;[11] and (3) Hengelmann had a conflict with Gayle, another African-American nurse, in August 2011.

- O'Laughlin – because she talked down to an African-American patient.

- Diane Carli – because Carson overheard her lamenting about how blacks were moving into her neighborhood.

R. 76 ¶ 77. Additionally, Carson testified that some of the nurses "were racist, you know, making remarks." She stated that Meier told her, "I don't like the way Sharon [Gayle] talks to me. I don't like what she says to me, . . . she's intimidating, she's a bully," and "I don't like the way that [Franzier-Jones] talked to me." R. 79-2 at 164-65 (409:24-410:8). Carson further testified that she told Schissler the nurses were racist and that she "gave him evidence" of their racism and "documentation" of patient complaints, *id.* at 165 (410:16-24), though the record does not include any documentation of the complaints Carson refers to or anything supporting what "evidence" she gave Schissler. Nevertheless, the Court must credit Carson's testimony at this stage (even though much of it borders on conclusory). Carson has presented just enough evidence that could demonstrate the other nurses harbored discriminatory racial animus towards her.

Moving to the second element, Carson is unable to demonstrate that the nurses' racial bias proximately caused Carson to be fired. The parties do not dispute that Harrell interviewed twenty-three nurses. Of the twenty-three nurses, thirteen explicitly complained about Carson. Of the thirteen complaining nurses, at least two of them—Thompson and Gayle—are African American. R. 76 ¶ 38. Even if four

---

[11] Presumably, Carson is implying that the information was not to be made public.

nurses may have harbored racial animus towards Carson—e.g., Meier, Hengelmann, O'Laughlin, and Diane Carli—there would still be nine out of twenty-three nurses who complained about Carson. Based on those numbers, in conjunction with Carson's acknowledgment that she was a "strict" manager and had been "closely monitoring" her staff, no reasonable jury could conclude that the results of the climate assessment were tainted by nurses who harbored racial animus towards Carson. *See generally Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) ("[The plaintiff's] ability to point to a few co-workers who tolerated his attitude is not sufficient to show that he met [the defendant's] legitimate expectations."). The four nurses alone could not have caused the overall results to be so generally negative towards Carson or consistent across the board. Indeed, there is no evidence that the four nurses who Carson testified were racist acted in concert or in any way sought out other nurses to join them in their attempt to get Carson fired. The only evidence in the record establishes the contrary. Meier, O'Laughlin, and Hengelmann all testified that they did not want to get Carson in trouble or fired when they confided in Harrell. R. 76 ¶ 34. Obviously, the nurses would not necessarily admit that their motive was to get Carson fired, but Carson has not provided information that in any way rebuts what the allegedly racist nurses testified to or the consistency of the complaints from the nine other complaining nurses.

Furthermore, the Seventh Circuit has explained:

[A] decisionmaker is not required to be a paragon of independence. It is enough that the decisionmaker is not wholly dependent on a single

source of information and conducts her own investigation into the facts relevant to the decision. To require much more than that would be to ignore the realities of the workplace. Decisionmakers usually have to rely on others' opinions to some extent because they are removed from the underlying situation. But to be a cat's paw requires more; true to the fable, it requires a blind reliance, the stuff of singular influence.

*Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009) (quoting *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009) *rev'd on other grounds* ___ U.S. ___ 131 S. Ct. 1186 (2011)); *see Reed v. Lincare, Inc.*, 524 Fed. Appx. 261, 262 (7th Cir. 2013) (explaining that "an employer opens itself up to charges of discrimination when it *blindly* relies on the reports of a racist employee" (citing *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 917-18 (7th Cir. 2007); *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004))). Here, the climate assessment was *not* the sole source of information Harrell relied on in determining that Carson should be fired. Harrell also considered Carson's PIP, which was required due to Carson's negative 2009-2010 evaluation and did not involve any direct input from the four allegedly racist nurses. R. 46-2 at 20-21 (52:5-53:12). The PIP *required* Carson to change her behavior and managerial style, and Harrell's consideration of the totality of information before her indicated that Carson had not. This is true despite Carson's claim that Harrell had not received any complaints about her until Schissler requested the climate assessment in August 2011. R. 77 ¶ 38. Harrell would not necessarily have been privy to the scope and significance of the lower-level nurses' complaints before they were explicitly brought to her attention. The consistency of the information in the PIP, which was the result of Carson's deficient yearly reviews, and the climate assessment provided Harrell

with a sufficient backdrop to make a business decision that Carson needed to be fired. No reasonable jury could find that the collective information before Harrell—all information Harrell was entitled to consider, *see Martino*, 574 F.3d at 453—demonstrates that Harrell was duped into firing Carson. This determination is bolstered by the fact that Harrell herself is African-American. R. 76 ¶ 43.

The conclusion reached here might be different if the following three facts were true: Harrell decided to fire Carson (1) by relying only on the climate assessment; (2) there were only four complaints about Carson in the assessment; and (3) the complaints came from the four nurses Carson contends are racist. But under the facts in this case, even taking all of the evidence Carson submitted in the aggregate, Carson cannot establish under the cat's paw theory that a reasonable jury could find in her favor.

## B.    The Indirect Method

Carson uses the same evidence to establish a claim under the indirect method, but for a number of reasons, it is still not enough to create a triable issue of fact on the question of whether she lost her job because of racial discrimination.[12] First, Carson must demonstrate she was performing her job satisfactorily. *See Hester*, 726 F.3d at 946 (explaining that a plaintiff must provide evidence that the defendant's "adverse actions were motived by his gender, race, or age, rather than

---

[12] When addressing Carson's evidence under the direct method, the Court discussed why Carson cannot demonstrate her comparators were similarly situated to her. For those same reasons, Carson cannot satisfy the fourth element under the indirect method—i.e., that UCMC treated similarly situated employees out of her protected class more favorably.

his unsatisfactory performance"). Carson provides evidence that she was sufficiently performing *some* parts of her job during her employment with UCMC. For instance, Carson testified that Schissler told her that physicians had favorable remarks about her, that she had addressed some physician concerns, that she completed her assignments on a timely basis, and that he was pleased to see her assisting others throughout the Unit. R. 77 ¶ 28. In an email dated Friday, November 12, 2010, Fulton wrote that "[Carson] is to be commended on these results" when describing certain results from a nursing staff survey. R. 55-7. It is also undisputed that Carson changed the system for treating patients from a "first come, first served" basis to a scheduled system. R. 77 ¶ 24. However, the fact that Carson received some positive affirmation about her work does not mean she was sufficiently performing her job on the whole, let alone at the time of the adverse action. *See Weber v. Univs. Research Ass'n*, 621 F.3d 589, 594 (7th Cir. 2010) (explaining that satisfactory past performance reviews are insufficient, as the plaintiff must demonstrate she was meeting expectations when the adverse employment action occurred); *Young-Gibson v. Bd. of Ed. of City of Chi.*, No. 11 C 8982, 2013 WL 4606785, at *8 (N.D. Ill. Aug. 29, 2013) ("[M]eeting business expectations as [to] some aspects of her job is insufficient to establish that she met . . . performance expectations as to every aspect of her job." (citing *Martino*, 574 F.3d at 454; *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004))).

Carson admits that retention of nurses in the Unit was a requirement of her job and that she was subject to the Civility Policy. R. 46-1 at 49-50—133:16-134:4.

The job description highlighted the importance of nurse retention and Carson's responsibility to promote positive staff morale and interpersonal communication skills. R. 76 ¶¶ 7-8. Carson's performance reviews each year indicated that Carson needed to improve in those areas. *Id.* ¶¶ 11-13, 21. The PIP further stated that "staff recruitment and retention are critical to the success of [UCMC's] operation. *Id.* ¶ 24. Yet, the nurses' complaints, the results of the climate assessment, and Carson's 2009-2010 evaluation (which included surveys regarding Carson's management of the nurses) led Harrell to conclude Carson had not changed her managerial style—despite Carson being given ample opportunities to do so. A large percentage of the nurses continued to complain about Carson and the overall low morale of the Unit. *Id.* ¶ 56. Carson might disagree with the final conclusion of how well she was performing her job, but the Court will not second-guess UCMC's ultimate assessment of the information that led to Carson's termination. *See Mmubango v. Leavitt*, 225 Fed. Appx. 393, 396 (7th Cir. 2007) ("[T]he mere fact that [the plaintiff] disagrees with [the defendant's] assessment of his skills is insufficient to establish that [the defendant] did not honestly believe its assessment to be correct. Nor is it the court's role to second-guess an employer's business judgment about an applicant's qualifications.") (internal citation omitted). And any argument that the information relied on was tainted by racial animus is not persuasive, as the Court has already explained why Harrell could reasonably rely on the results of the climate assessment. *See Gillems v. Hapag-Lloyd Am., Inc.*, 523 Fed. Appx. 415, 417 (7th Cir. 2013) ("[E]ven if Ross *had* fabricated all of the other complaints against

Gillems, as long as Burtin and Smerdon—the decisionmakers—genuinely believed that Gillems acted inappropriately, they were entitled to act on that belief.") Accordingly, on the facts of this case, a reasonable jury could not conclude Carson was satisfactorily performing her job or that the decision maker believed Carson was satisfactorily performing her job.

Even if Carson could make out a *prima facie* case for race discrimination, her claim would still fail because she cannot overcome UCMC's nondiscriminatory reason for her firing. As thoroughly discussed, Carson was fired because she was not adequately performing her job. To establish that UCMC's reason for firing her was pretext for race discrimination, Carson would have to demonstrate that UCMC is lying. The Seventh Circuit has explained,

> Pretext means a lie, specifically a phony reason for some action. Thus, the question before us is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge. It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.

*Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (internal quotation marks and citations omitted). Carson has not provided any evidence that Harrell did not "honestly believe" Carson was not adequately performing a significant portion of her job. Again, Carson may disagree with Harrell's assessment and believe she should have kept her job. But "[a]n inquiry into pretext requires that [the Court] evaluate the honesty of the employer's explanation, rather than its validity or reasonableness[.]" *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013).

Put simply, it is irrelevant if Carson's conduct was "not egregious enough to justify her termination, as long as [Harrell] believed [it was]." *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014). Without evidence that Harrell used the climate assessment results and Carson's prior evaluations "as a mask to hide unlawful discrimination," Carson cannot rebut UCMC's nondiscriminatory reason for firing her.[13] *See Hill*, 724 F.3d at 968.

## II.   Age Discrimination

In order for Carson to succeed on her age discrimination claim, she "must show that age actually motivated the adverse employment action. Put differently, age must have played a role in the employer's decision-making process and had a determinative influence on the outcome." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010) (internal citation omitted). As a general matter, Carson uses much of the same evidence to prove age discrimination as she used to prove race discrimination. Accordingly, because the elements for race discrimination and age discrimination under the indirect method are the same, the Court can quickly reject Carson's attempt to utilize the indirect method here: Carson still cannot demonstrate that: (1) she was performing her job satisfactorily; (2) she was treated less favorably than similarly situated employees; and (3) UCMC's reason for terminating her employment was pretext for age discrimination.[14]

---

[13] This would also be the case even if the climate assessment results were tainted by racial animus of the nurses—though the Court previously rejected that argument when analyzing Carson's claim under the cat's paw theory.

[14] Because Carson fails on *at least* these three elements, the Court is not required to

The only additional evidence that Carson provides in support of her age claim is a statement she claims Schissler made when denying her reimbursement request.[15] Allegedly, Schissler stated, "How old are you? . . . Well, Denise is like 30 - - 35, 34, in her 30s." R. 79-2 at 117 (362:13-16). Again, Schissler was not the decision maker, the comment was not made contemporaneously with the termination decision, and the comment was not made in the context of that decision. Additionally, at most, the statement can be considered a stray remark, as it does not (on its own or in conjunction with the rest of the record evidence) rise anywhere near the level of what would be required to raise an inference of age discrimination. *Compare Martino*, 574 F.3d at 453 (explaining that the term "oldtimer" "just isn't that egregious"), *with Ezell v. Potter*, 400 F.3d 1041, 1051 (7th Cir. 2005) (describing age comments that may support a claim for age discrimination, including referring to "[the plaintiff's] gray hair and beard, comment[ing] on his slowness and suggest[ing] that because of his speed, [the plaintiff] should consider another line of work"). Thus, having already addressed all of the other evidence Carson submitted under the direct method, the Court finds that there is not a triable issue of material fact on Carson's age discrimination claims either.

---

resolve whether two African-American nurses—Gayle and Cavers—actually replaced Carson, which the parties dispute. *See, e.g.*, R. 76 ¶ 65.

[15] The Court is cognizant of UCMC's argument that the statement Carson alleges that Schissler made was said at Carson's second deposition even though Carson stated at the first deposition that she did not have any additional evidence of discrimination. *See* R. 76 ¶¶ 73-76. At this stage, however, the Court must credit Carson's testimony, regardless of when or under what circumstances she proffered the evidence.

**CONCLUSION**

Carson has not provided sufficient evidence for a reasonable jury to find in her favor on either of her discrimination claims. UCMC's motion for summary judgment, R. 44, is granted, and the case is dismissed.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: September 29, 2014